BEATTY, Justice
(dissenting).
I respectfully dissent. I would reverse the judgment on the merits, because I do not feel that the plaintiff proved the element of reliance.
Mrs. Pierce conceded that she paid no attention to the statements Bullock made at the time the application was executed and that Mr. Pierce knew that questions would be asked of him in a medical examination. In fact, during cross-examination, Mrs. Pierce answered in this way:
“Q. Did Curtis [Bullock] tell you that if anybody asked Mr. Pierce whether he had any dizziness, fainting, convulsions, headaches, speech defect, paralysis or stroke, mental or nervous disorder on behalf of John Hancock that he could say no?
“A. Well, he didn’t say that. He said if — he didn’t say—
“Q. Did he say no?
“A. No, he didn’t say that.
“Q. Did Curtis say that if anybody on behalf of John Hancock asked Mr. Pierce about soundness [sic] of breath, asthma, he could say no?
“A. He never — he never said anybody would even ask from John Hancock cause he said he was John Hancock.
“Q. You having trouble answering my questions? Maybe let me repeat it again., Did Curtis say to you—
“A. I’m sorry.
“Q. —or to Glen Pierce in your presence, Glen, if anybody on behalf of John Hancock, anybody else besides me asks you about shortness of breath, persistent hoarseness, cough, blood spitting, even though a truthful answer would be yes, you can say no?
“A. Well, he didn’t — I didn’t hear him tell Glen that.
“Q. You didn’t hear him tell him that. Did Curtis Bullock ever say to you or to Glen Pierce in your presence that if anybody on behalf of John Hancock asks Mr. Pierce about chest pain, that he could say no even though it was truthful to [say] yes?
“A. Well, I didn’t hear him ask Glen. I wasn’t with Glen every time he talked to Curtis, so I don’t know.
“Q. Did you ever hear—
“A. No.
“Q. I tell you what. I get confused sometimes in the middle of a trial. Let me ask you the question again. Maybe I said it wrong. Did Mr. Bullock in your presence, or, to Mr. Pierce or to you — see, I can see why you’re confused. Even I’m confused with my question. Let me start over. Did Mr. Bullock say to you or to Mr. Pierce in your presence that if somebody from John Hancock asks you about chest pain, you can say no, even though the answer is yes.
“A. I didn’t hear him say that.
“Q. Okay. Did Mr. Bullock say to you or to Mr. Pierce in your presence that if somebody from John Hancock asks him about prostate, he could say no, even though the truth was yes?
“A. I didn’t hear him say it.
“Q. Okay. Did anybody — did Mr. Bullock ever say to you or to Mr. Pierce in your presence that if somebody from John Hancock asks him about rheumatism, arthritis, *723 disorder of the muscles or bones, that he could say no if a truthful answer was yes?
“A. I never heard him say that if anybody called from John Hancock. I don’t know.
“Q. Did Mr. Bullock ever say to your husband or to you — I’m sorry — to you or to your husband in your presence that if anybody from John Hancock asks him about tumors, that he could say no even though the truth was yes?
“A. I don’t — I never heard him say that if anybody called from John Hancock on any of the questions.
“Q. So, your understanding was when you finished talking to Mr. Bullock about all these applications that you and Mr. Pierce still had to tell the truth?

“A. Oh, sure, yes.

“Q. Now, let’s look at this up here. This is a copy of [an] application that Dr. McAtee will testify was filled out in his presence.
“MR. BEDSOLE: Dr. who?
“MR. HARDIE: Sorry. Dr. Allen.
“MR. BEDSOLE: You are confused. Go ahead.
“MR. HARDIE: I’m really young.
“Q. Dr. Allen, and here’s this question, Two, ever been treated for any known indication of Two C, shortness of breath, persistent hoarseness, cough, blood spitting, bronchitis, pleurisy, asthma, emphysema, tuberculosis, or chronic respiratory disorder. If that question were asked about your husband, the truthful answer would be yes, wouldn’t it?
“A. Yes.
“Q. But down here we have an ‘X’ in the no, don’t we?
“A. Yes, it shows it.
“Q. Ever been treated for any known indication of chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack, or other disorder of the heart or blood vessels, the truthful answer to that would have been yes; isn’t that correct?
“A. That’s right.
“Q. But this shows no; isn’t that correct?
“A. That’s correct.
“Q. To E, jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion or other disorder of the stomach, intestines, liver, or gallbladder, and I understood you to say that a truthful answer to that would have been yes?
“A. Yes, but it looks like he’s got it marked twice.
“Q. Well, there’s an ‘X’ under yes and a line under no. Sure enough to put you on notice to ask about that; isn’t it?
“A. Yes, I can’t understand why John Hancock didn’t write to Dr. McAtee. He could have found out everything.
“Q. Well, be fair to me and you’ll answer my questions.
“A. Yeah.
“Q. All right. To H, have you ever been treated for any known indication of neuritis, sciatica, rheumatism, arthritis, gout, disorder of the muscles or bones, including the spine, back or joints, truthful answer to that would have been yes.
“A. That’s right.
“Q. And what seems to be no is marked here. And the same about J, disorder of the skin, lymph glands, cyst, tumor, or cancer, truthful answer to that would have been yes, but no seems to be marked here. Now, did you and Mr. Bullock and Mr. Pierce get together and work up some kind of scheme where you could go ahead and lie to John Hancock?
“A. Oh, no, no.
“Q. It as never your understanding after you talked to Mr. Bullock that if Dr. Allen asked those questions that Mr. Pierce could lie?
“A. He didn’t tell him — he told him that he had, if he was all cleared up these — if he was all cleared up, that was all that mattered; that he didn’t have any more of these problems, and that was all that mattered.
*724 “Q. So, Mr. Bullock was assuring your husband that if everything was cleared up, he’d probably get the policy, wasn’t he?
“MR. PARTRIDGE: Object to the form of the question.
“THE COURT: Overrule.
“Q. But Mr. Bullock didn’t tell your husband or you that Mr. Pierce could lie when Dr. Allen asked him questions, did he?
“A. He said that, that if he was all cleared up, there was no point in discussing it.
“Q. Do you have trouble answering that question? He did or he didn’t tell you to lie?
“A. He didn’t, he didn’t tell — I didn’t hear him tell my husband one way or the other.
“Q. Did you hear him tell your husband to lie?
“A. I didn’t hear him tell him anything.
“Q. Did you understand — you, Mrs. Pierce — is there anything in any of your conversations with Mr. Bullock that led you, Mrs. Pierce, to believe that your husband should lie?
“A. No.” (Emphasis added.)
By her own testimony, Mrs. Pierce conceded that she paid no attention to those statements, that she knew her husband would undergo a medication examination before the policy was issued; that she knew that her husband would have to tell the truth in connection with his insurance application; and that there was nothing in their conversations with Bullock that led her to believe that Mr. Pierce should lie. Thus, there was no evidence that Mrs. Pierce either (1) believed Bullock’s alleged statements or (2) acted in reliance upon them.
HOUSTON, J., concurs.